HAMILTON
vs.
BERRY, &c.

brought in the name of the Commonwealth for the use of the person injured, according to sec. 60, of the Code of Practice.

---

## Hamilton *vs.* Berry, &c.

### APPEAL FROM BATH CIRCUIT.

Case 11.

1. It is not authoritatively decided in the case of *Rogers v. Thomas,* 1 *B. Monroe,* 393, that one who has contested a will before the county court, shall not thereafter contest it by bill in chancery in the circuit court.

2. Shall one who has been a party opposing the probate of a will in the county court, be barred thereby from filing a bill in the circuit court, to contest the will under the 11th section of the act of 1797—QUERE.

3. One should not be considered barred, who had been only once named in the record as a party, when the whole record showed, that others had been the conductors of the opposition throughout.

Judge MARSHALL delivered the opinion of the court.

June 20.

A paper purporting to be the will of Eliza Ann Hamilton, having been admitted to record in the Bath county court, after a contest in that court, the case upon the probate, was carried to the Bath circuit court, by appeal, and that court determined that the instrument was valid, and should be recorded as a will of personalty, but not as a will of land or slaves. From that decision, Berry, the executor, appealed to this court, where it was decided that the will was valid, and sufficiently proved for all purposes, and the case was remanded to the circuit court with directions to affirm the judgment of the county court establishing the will and admitting it to record. The opinion of

Case stated.

HAMILTON
*vs.*
BERRY, &c.

this court, reported in 10 *B. Monroe*, 129, is referred to, as showing the facts respecting the will and its execution, also the nature of the contest, and the principles of the decisions then made.

The case referred to was decided in this court, in January 1849, after a litigation of about three years, and after two trials, in which numerous witnesses were examined, and in one of them a bill of exceptions was taken, by which the testimony was brought up to this court.

Since the will was established by the mandate of this court, viz: in October, 1851, George Hamilton, one of three brothers of Eliza Ann Hamilton, who with their mother, were her only heirs, filed this bill in the Bath circuit court, claiming to contest the validity of the will by bill in chancery, under the 11th section of the act of 1797, *Stat. Law.*

To this bill, John Berry, the executor, and Rebecca Hamilton, the mother, and James and Archibald W. Hamilton, brothers of the testratrix, were made defendants, and Berry, together with an answer, filed a plea in bar, averring and relying upon the fact, that in the proceedings as above referred to for proving the will, George Hamilton was a party opposing the probate. And, as conslusive evidence of his having been a party, it states, that at the February county court, 1845, of Bath county, a writing purporting to be the will, &c., was produced in said court and ordered to be filed; and at the same term, on motion of complainant, and James and Archibald W. Hamilton, the proof of the will was continued until the next term; and alleging that the complainant thereby became a party to the controversy contesting the will in said county court, and that said order continues in force and unreversed; it avers that the record thereof is conclusive against the matters and charges in complainant's bill, and the same is thereby forever barred, said will being afterwards, viz: at the ——— term of said court duly admitted to record, &c. The plea further avers, that in the contest and liti-

gation respecting the validity of said will in the county and circuit courts of Bath county, the complainant did, in fact, oppose and resist the establishment and recording of said will, by testifying against the validity thereof as a witness.

The case came on for hearing upon the plea, that is, upon the bill, the record therein referred to and filed, as showing the proceedings upon the probate in the county and circuit courts, and the plea itself; and it is proper to state that the complainant referring in the bill, to the order of continuance relied on in the plea, says he is informed that he is named in said order as joining with his brothers in the motion, and that his name is afterwards dropped, but that both the insertion and discontinuance of his name, were without his knowledge or authority; that he never appeared as a party opposing the will, was not a party in the case, but on the contrary, was a witness in each of the lower courts, &c.

The court regarding the plea as presenting a sufficient bar, dismissed the complainant's bill, and dissolved the injunction which he had obtained against the qualifying of John Berry as executor.

The sufficiency of the plea, to bar the complainant from contesting the validity of the will by bill in chancery, depends upon the question whether the 11th section of the statute of 1797, which gives this remedy for contesting the validity of a will which has been admitted to probate, withholds it from every person who may have appeared in the county court as a party contesting the probate. And whether, if such be the true construction of the statute, the record from the Bath county court, contains such evidence of the complainant's appearance in that court, as a contestant, or as a party to the contest, as should be deemed sufficient to preclude him from this remedy.

The 11th section of the act of 1797, *Stat. Law*, 1543, after providing for the immediate probate of the will when offered in the proper county court, proceeds to say—"if however, any person interested shall,

1. It is not authoritatively decided in the case of *Rogers v. Thomas*, 1 B. Monroe, 393

HAMILTON
*vs.*
BERRY, &c.

that one who has contested a will before the county court, shall not thereafter contest it by bill in chancery in the circuit court.

within seven years afterwards, *appear*, and by his bill in chancery, contest the validity of the will, an issue shall be made up, &c." In the case of *Rogers v. Thomas*, 1 *B. Monroe*, 393, this court in commenting on this 11th section, seem to regard the statute as referring to such person only as had not before appeared and contested the will. The inference from which would be, that a person who had appeared and contested the will, was not authorized to file the bill to contest it in chancery. What was said on this clause in the case referred to, cannot, however, be regarded as an authoritative judicial exposition of the statute, because the question was not presented, whether a contestant in the county court might, after being there defeated, renew the contest by a bill in chancery. The framers of the act of 1797, probably did not contemplate any contest upon the presentation of the will for probate in the county court, and may have looked to the filing of the bill as the first act of opposition. But experience has proved, that where the persons who consider themselves interested against a will have the opportunity, they generally commence the contest at the earliest stage of the probate. Such was the case before the enactment of the statute of 1842, by which the appeal was given to the circuit court in cases of probate. And, yet, the proviso to the third section of that act, 3 *Stat. Law,* 586, seems to indicate that the legislature understood or intended, that any person interested, who was not a party served with process, and did not appear by himself or counsel in the circuit court, might contest the validity of the will as provided in the 11th section of the act of 1797. True, this is not the necessary inference from the proviso, nor can it be conclusively inferred from the language of the 11th section that a simple appearance in the county court in a case of probate, should absolutely preclude the party from contesting the will in chancery. The dictum in the case of *Rogers v. Thomas*, implies that the remedy is withheld, not from one who has merely ap-

peared before, but from such as have appeared and contested the will before, that is, in the ordinary course of probate. Commonly, indeed, to appear in court, in a case there litigated, means to assume the attitude of a contestant, to make oneself a party to the litigation, and to take a position which makes the proceeding and decision justly obligatory and conclusive. If, therefore, it be assumed that the reference in the 11th section to a future appearance and contesting of the will, implies a negation of a prior appearance, it is doing no violence to say that the prior appearance intended, is an appearance as a contestant, which would give to the clause the interpretation intimated in the opinion just cited.

But the words, "if however, any person interested shall within seven years afterwards appear, &c., do not necessarily import a negation of any prior appearance. They may refer to an appearance in the court of chancery, to file the bill. In Virginia, it is true, where this clause of the statute was first enacted, the county court in which the will may have been first offered for probate, was the court in which the bill was to be filed. And in view of this fact, the reference to a future appearance in the same court, may have been intended to denote a first appearance in that court, and thus to negative any prior appearance in the course of the probate. But, if, as the court in *Rogers v. Thomas, supra,* assumes, and as the first clause of the 11th section seems to imply, the legislature contemplated a probate in the first instance without contest, and in this view, provided for an original contest by bill in chancery, it by no means follows that if they had contemplated a contest in the first instance, they would have prohibited the renewal of the contest in a more solemn and certain form; and it is by no means certain that they intended that a person who should in the first instance, when perhaps he was not fully prepared, contest and attempt to prevent the probate, should be thereby precluded from resorting to the remedy by bill. Much less

<div style="margin-left:auto;width:30%;">

HAMILTON
*vs.*
BERRY, &c.

2. Shall one who has been a party opposing the probate of a will in the county court be barred thereby from filing a bill in the circuit court to contest the will, under the 11th section of the act of 1797. QUERE.

</div>

is it to be assumed, that the slightest possible indica-
tion of hostility to the probate in the first instance,
was intended by the framers of the statute as a bar
to any further contest by the same person. But in our
system of judicature, the county courts did not have
chancery jurisdiction when this statute was adopted.
And the same words, which in the Virginia statute,
refer to and authorize the filing of a bill in the county
court in which the probate had been first made, are, and
always have been understood in our statute, as refer-
ring to and authorizing the filing of a bill in a differ-
ent court, that is, in the circuit court. If, therefore, an
appearance in a judicial proceeding, means the first
coming of the party into court in that proceeding,
and, if therefore, there be an apparent incongruity
in applying the words—"if any person shall after-
wards appear and file his bill," to one who had pre-
viously appeared in the same court, and upon the
same question, which may be the case in Virginia,
there is no incongruity in applying the same words
to one who has appeared in the county court upon the
question of probate, and afterwards files his bill in
chancery to contest the same will. For his appear-
ance in the county court, is no appearance in the cir-
cuit court. And when he files his bill there, he then
appears or comes for the first time in that court.

But further than this, if we pursue the technicali-
ties of the subject, we percieve, that upon the termi-
nation of the contest, if there has been one in the county
court, that is, upon a judgment being pronounced for
or against the will, the parties, after the expiration of
that term, are out of court, and the contest can only
be renewed by some new proceeding, in the institution
of which, whether in the same or another court, the
party moving comes into court for the first time in
that proceeding, and may be properly said to appear,
even in the most narrow and technical sense of that
word.

It may be said, that if the word "appear," in this
clause, means nothing more than coming into court,

that is fully implied by the other words of the sentence, as in filing his bill he must come into the court. But although the word in this sense may not have been necessary, it is neither insensible, inappropriate, nor untechnical. And the mere fact, that in that sense it was unnecessary, and might have been dispensed with, is no sufficient reason for giving to it a sense beyond its natural import, by which it is to be made the governing word of the sentence by which important rights are to be peremptorily determined. The rule requiring that every word of an instrument shall, if possible, have some effect, does not require it to be assumed that the writer has expressed his ideas in the fewest possible words, and, therefore, that every word which in its ordinary sense does not change or qualify the import which the sentence would have without it, must be understood in some different or extraordinary sense, in order to give it effect. Although the statement that a person does a particular act in court necessarily implies that he appears or comes into the court, both facts, that is, the appearance or coming into court, as well as the act done, are frequently, perhaps commonly stated in making up the record of the proceeding. So far then as the mere language of this section is to be considered, we perceive no necessity nor sufficient reason for giving to the word 'appear,' any retrospective meaning or operation, or any decisive influence in excluding a party who had appeared in the county court, in the proceeding for probate, from appearing by bill in the circuit court, to contest the will. And the section may well be interpreted as if its words were, "if however, any person interested shall, within seven years after the probate in the county court come into, or appear in the circuit court, and file his bill in chancery, contesting the validity of the will, &c." And, although, under this interpretation, the word "appear," would express only what would be implied without it; this does not seem to be so great an objection as that to which the opposite construc-

tion is liable, viz: that it gives to the word 'appear,' a force and meaning greatly beyond its natural import, and not necessarily to be implied from its use in the sentence.

Considering this section as we should, with reference to our own system of judicature, it is only by going behind the language, and considering not merely the objects of this enactment, but also the expediency and justice upon general principles of holding a person who has once been a party participating in a regular litigation, as forever afterwards bound by the result, that we find any just or sufficient ground for the inference, that the legislature intended to exclude from the remedy, by bill in the circuit court, every person who had been a party contesting or opposing the will in the county court. But these principles, although as admitted, they may furnish proper and sufficient grounds for extending the constructive effect of the statute further than its words require, must also suffice to restrict this constructive operation within the limits prescribed by justice and expediency. And, although, if under these principles, the statute might, or should be construed, as giving the remedy by bill in chancery to such persons only as had not appeared and contested the will in the county court, we are of opinion, that in order to exclude a person interested from the remedy by bill in chancery, on the ground now in question, it is not sufficient that the record of the county court shows, that on a single occasion, at the very commencement of the proceeding, his name is united with those of others who afterwards opposed the will, in a motion for continuance, while the same record shows through a series of subsequent orders, that he was not afterwards regarded as a party, and never acted as such in court, but that the other persons with whom he had been first named, acted and were treated throughout by the propounder of the will, by the court, and by all concerned as the sole contestants. The bill, as already stated, alleges that the complainants name was

3. One should not be considered barred who had been only once named in the record as a party, when the whole record showed that others had been the conductors of the opposition throughout.

inserted without his authority or knowledge, in the order stating the motion for a continuance of this proof or probate, upon the first presentation of the will. And it might be inferred from the entire subsequent record, that the clerk alone was apprized of the fact. All subsequent motions and proceedings on the part of the contestants, are in the name of James and A. W. Hamilton alone. The case is entitled as between Berry and them alone. They alone prayed the appeal to the circuit court, and are alone mentioned as appellants in the appeal bond, while George Hamilton, the present complainant, was examined as a witness on the part of the contestants, which, if he had been considered a party, could not have been done but by consent, which does not appear. He was also examined in the circuit court; and in the bond executed by Berry, to supercede the judgment of that court, and bring the case here, James and A. W. Hamilton alone are mentioned as obligees, and as constituting the opposite party, and there is no pretence that George Hamilton was a party in this court.

Besides other questions, it may be asked if he was a party in the county court, how did he get out of the case so as to be a witness, so as not to be a party in the circuit court, or in this court. The fact is, the order which alone is relied on to prove his appearance as a party, is equivocal, or at least not conclusive as to the attitude then assumed by the movers of the continuance. It is no formal entry of opposition or of appearance, as parties contesting the will. The motion may have been made for the purpose of determining whether to contest the will or not. And although the subsequent orders and proceedings show conclusively that James and A. W. Hamilton did contest the will most strenuously, there is nothing either in or out of that record, to identify the complainant with them in that contest. His testifying for them as a witness was inconsistent with his being

a party. And this, with the other facts apparent on the record, tend to prove that he was not a party.

The question now is, whether the record contains such evidence of the complainant's having been a party contesting the will in the county court, as to preclude him from his remedy in chancery, even upon the construction intimated in *Rogers v. Thomas.* And although it is certainly true, that he had full opportunity of becoming a party, and contesting the will, yet as it does not appear that he united in the contest either as a party in court, or by arrangements or steps taken out of court, we cannot, upon the case now before us, say that he is excluded from the terms of the statute, or from the remedy which it gives. We are not called on to decide what might be the effect of facts not alleged in the plea.

Wherefore, the decree dismissing the bill is reversed, except in so far as it dissolves the injunction; and the cause, except as to the injunction, which was properly dissolved, is remanded for further proceedings.

ROBERTSON and DAVIS for appellant; FARROW for appellee.

---

14m 33
99  155

14bm 33
106  801

Case 12.

*Warfield vs. Davis.*

ERROR TO MASON CIRCUIT.

1. Whether a common law court has power to require of a defendant who is sued by one claiming right to freedom, binding himself to have such person forthcoming at a subsequent term of the court, and not to sell or dispose of such person, or send him out of the state, or has not such power, yet, if such bond be given, it is obligatory as a common law obligation, and suit may be maintained thereon for a violation of its conditions.

2. One whose agent is sued in respect to property which he holds for his principal, and who has knowledge of the pendency of the suit, is bound by the decision against the agent.

3. Where the right of one suing for freedom is doubtful, it is not usual for hire to be adjudged to the plaintiff, though his right be established.

4. Where one held as a slave sues for freedom, and a bond is required by the common law judge, and given by the defendant, stipulating for the forthcoming of the plaintiff at the next term of the court, that he will not sell or remove him out of the state, but without any stipulation to pay hire, upon the right of freedom be adjudged to plaintiff, though the conditions of the bond be broken, there can be no hire recovered for the time preceding the judgment establishing the right to freedom, but for subsequent hire and the expenses incident to recovering his freedom from one to whom the defendant sold the plaintiff pending an appeal, he had a right to recover.

Judge SIMPSON delivered the opinion of the court.

Whether a court of common law has the power or not, to make an order in a suit for freedom, directing the sheriff to hire the plaintiff out, unless the person claiming him as a slave, shall execute a bond with security, conditioned to have him forthcoming at a subsequent term of the court, and in the mean time not to sell or dispose of him, or send him out of the commonwealth; we have no doubt, that if such a bond be executed, it is according to numerous decisions upon the subject, valid and obligatory as a common law bond. The bond is executed voluntarily, the claimant having his option to execute it or not. It has a sufficient consideration to sustain it, and is not immoral in its tendency, or inconsistent with the policy of the law. It is just such a bond as the chancellor has an undoubted right to require in similar cases, and is frequently necessary to secure to the plaintiff the full benefit of a judgment in his favor, in the suit which he is prosecuting to establish his freedom. We think, therefore, the plaintiff had a right to maintain this action on the bond, whether the common law judge had the power to make the order under which it was executed or not.

We are also of the opinion, that Warfield is bound by the judgment which the plaintiff obtained against Tingle, in the suit brought by him to establish his right to freedom. Tingle was Warfield's agent, and had the plaintiff in his possession in that capacity, when the suit was instituted, and it is perfectly evident that Warfield not only knew of the pendency of the suit, but acted, and was regarded by the court as the real

1. Whether a common law court has power er to require of a defendant, who is sued by one claiming right to freedom, binding himself to have such person forthcoming at a subsequent term of the court, and not to dispose of or sell such person or send him out of the state, or has not such power, yet if such bond be given it is obligatory as a common law obligation, and suit may be maintained thereon for violation of its conditions.

2. One whose agent is sued in respect to property which he holds for his principal, and who has knowledge of the pendency of the suit, is bound by the decision against the agent.

party in interest in defending it. His privity, there-fore, is sufficiently established, and he is as much bound by the judgment as if he had been a defend-ant in the suit. The most important question in the case however, is as to criterion, by which the plain-tiff's right of recovery upon the bond is to be regula-ted and governed. On the the part of the defendant, it is contended, that the only breach of the bond, was the failure to have the plaintiff forthcoming at the May term, 1846, of the Mason circuit court, and that he sustained no real injury by that failure, and is consequently only entitled to nominal damages in this action. It is contended on the other side, that for this failure, the plaintiff, who has established his freedom, has a right to recover hires for all the time he was retained by the obligor in his possession, after the breach of the bond occurred, and also, such ex-penses as were incurred by him in returning to this state, after a final judgment was rendered in his fa-vor in the suit against Tingle, he having been in the meantime sold by Warfield, and taken to the south by the purchaser.

3. Where the right of one sueing for free-dom is doubt-ful, it is not usual for hire to be adjudged to the plaintiff though his right be established.

The verdict and judgment in favor of the plaintiff in the suit against Tingle, having allowed him but one cent in damages for illegal detention, is conclu-sive against his right to any hire before that suit was instituted. And as his right to freedom was very doubtful, until it was settled by the final judgment in his favor, the same principle which denied his right to compensation for services rendered before the institu-tion of the suit, would also deprive him of any right to it against Warfield, for services rendered during its pendency. Unless, therefore, this right has been se-cured to him by the bond sued upon, it has no exis-tence, and he has no available claim against the de-fendant for hires accruing during the pendency of the suit. Where a person suing for freedom, is hired out by order of the chancellor, the hires accruing during the pendency of the controversy, are disposed of ac-cording to the result of the suit; and in some cases,

where the complainants right to freedom was perfectly manifest, hires have been decreed against the defendant, from the commencement of the suit, where no order was made requiring the complainant to be hired out during its pendency. But no hires have been allowed in any case, so far as we are apprized, where the complainant's right to freedom was doubtful, and honestly contested by the person who claimed him as a slave.

The bond executed by Warfield does not contain any stipulation for the payment of hire. The sheriff was required to hire out the plaintiff, unless Warfield would execute a bond not for the payment of hire, but for the safekeeping and forthcoming of the plaintiff. The order contemplates Warfield's right to the possession of him without the payment of hire; and unless he was legally responsible for hire, a breach of his bond, in failing to have the plaintiff present in court, according to its condition, could not render him liable for it. We have already stated that he is not, according to the settled doctrine of the law, liable for any hire before the plaintiff's right to freedom was finally established, and therefore, the breach of his bond, which occurred, could not subject him to any such liability.

The plaintiff's detention in slavery, after he had been adjudged to be free, was however, illegal, and for such detention, he has a right to be compensated in damages, and for this injury the defendant is liable upon his bond. The sale of the plaintiff, during the pendency of the appeal, was also in contravention of the object of the bond, and consequently such reasonable expenses as were necessarily occasioned thereby to the plaintiff, after his right to freedom had been established, in availing himself of that right, and in returning to this state, he is also entitled to recover in this suit.

The court below, by its instruction, gave to the jury an unlimited discretion as to the amount of the recovery, provided it did not exceed the penalty of the

4. Where one held as a slave sues for freedom, and a bond is required by the common law judge and given by the defendant stipulating for the forthcoming of the plaintiff at the next term of the court; that he will not sell or remove him out of the state; but without any stipulation to pay hire, upon the right of freedom be adjudged to the plaintiff, tho' the conditions of the bond broken, there can be no hire recovered for the time preceding the judgment establishing the right to freedom, but for subsequent hire and the expenses incident to recovering his freedom from one to whom the defendant sold the plaintiff pending an appeal, he had a right to recover.

bond. In this respect the court erred, and induced the jury to find a verdict against the defendant for a larger sum than was authorized by the law and the testimony.

As the inquiry will be much restricted upon another trial, the same questions of evidence may not again arise in the cause, and they will not, for that reason, be noticed or passed upon at this time.

Wherefore, for the error of the court in its instruction to the jury, the judgment is reversed, and cause remanded for a new trial in conformity with this opinion.

ROBINSON and JOHNSON and TAYLOR for plaintiff; HORD and PAYNE for defendants.

---

## Hunt vs. Wilson.

### ERROR TO FLEMING CIRCUIT.

1. The only legitimate inquiry on the trial of a writ for forcible entry and detainer, is whether the defendant entered upon land, which at the time of the entry was in the actual possession of the plaintiff. The defendant cannot justify an entry in such case by showing title or right of entry. (4 *Bibb*, 192–313.)
2. The object of the statute is to compel parties to inforce their legal rights by process of law, not by strong hands at their discretion.

June 23.

Chief Justice HISE delivered the opinion of the court.

Case stated.

Uel Hunt on the 12th of August, 1850, sued out a writ against Rebecca Wilson, Sr. and Rebecca Wilson, Jr., for a forcible entry upon certain land then and theretofore in his possession. The inquisition on the premises, resulted in a verdict of the jury, that the defendants in the writ were guilty of the forcible entry complained of, and a judgment for restitution and for costs was given against them. The Miss Wilsons traversed this inquest, gave the bond as required by law, and carried the case to the circuit court, and upon the trial in that court, the jury found, by their

verdict, that the inquisition was not true, and thereupon a judgment was given by the circuit court in favor of the Miss Wilsons for their costs; and Hunt has brought the case up to this court, and demands a reversal of the judgment against him, because of the error committed by the circuit judge, to his prejudice, in refusing to give him a new trial. Although the finding of the jury, as alledged, was contrary to law, and unsupported by the testimony, and although the court had erroneously refused to instruct the jury as requested by the plaintiff in the writ, and had misdirected them by other instructions, which were given, the proof in the cause seems to present the following state of fact: That in the winter or spring of 1849, Hunt, the plaintiff in the writ, in fact forcibly entered upon the land, which had theretofore for a long time been claimed, occupied, and possessed by the Miss Wilsons, who resided upon their tract, the boundary of which embraced the land in dispute; that Hunt thus having ousted the defendants of their possession, held this land, and cultivated the same in the year 1849. The defendants, without resorting to the remedy provided by the statute for such cases, in the winter or spring of 1850, removed the fence farther up the creek, and entered upon, and afterwards put in cultivation, a part of the same ground, which Hunt had previously cultivated in the year 1849. Hunt attempted to re-set the fence at the place where it had been built by him, but the Miss Wilsons set it back again, and sowed the ground in oats in 1850. So it seems that Hunt first, early in 1849, violently enters upon the land occupied by the Miss Wilsons, and the Miss Wilsons then, early in 1850, enter upon the same land and resume its possession whilst it was occupied by Hunt, or at least it does not appear that he had abandoned the possession which he acquired by his unauthorized and forcible entry early in 1849, and then Hunt sues out his writ. Upon this state of fact being proven in substance upon the trial in the circuit court, Hunt's attorney asked the court to in-

struct the jury, "that if they believed from the evidence, that the plaintiff (Hunt,) was in possession of the land before the suing out of the warrant, and the defendants (the Wilsons,) entered upon the land and took possession against the consent of the plaintiff, they must find the inquisition to be true." The court apprehending that this instruction would mislead the jury if given without any qualification, refused it, but instructed them, "that if the Wilsons had been in possession of the land before Hunt entered upon it, fenced it in, and made a crop upon it in 1849, and that they (the Wilsons,) got possession again peaceably after that time, and before Hunt's possession had been continued for two whole years, that in such case Hunt could not recover.

Upon the facts stated, as collected from the proof, it is the opinion of this court, that the circuit judge erred in refusing the instruction as asked, and in giving the instruction as stated. He seemed to be of the opinion, that the previous forcible entry of Hunt upon the land occupied by the Wilsons, could be relied upon as a bar to this proceeding, when instituted by Hunt for a subsequent forcible entry by the Wilsons within two years upon the same land, or in other words, that the Wilsons in such case had lawful authority to re-enter upon the possession of Hunt *peaceably*, though without his consent, if such re-entry was made within two years after the forcible entry of Hunt. Such is not the law as enacted by the act of 1810, by which this remedy is provided, and this proceeding regulated, and as hitherto ruled by this court.

1. The only legitimate inquiry on the trial of a writ for forcible entry and detainer, is whether the defendant entered upon land which at the time of the entry was in the actual possession of the plaintiff, and the defendants cannot justify such entry, or avoid a recovery in this proceeding in such case, by showing that they have a good title to the land, or that they held the right of entry as settled by this court in the

Cox for plaintiff; HARLAN for defendants.